**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**RENEE C. BEAN,**

       **Plaintiff,**

**v.**                                       **Case No. 3:09cv429MCR/EMT**

**QUALIS CORPORATION,**

       **Defendant.**

_____/

# O R D E R

Renee C. Bean filed this lawsuit against her former employer, Qualis Corporation ("Qualis"), asserting a claim for gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-2, *et seq.* (doc. 1).[1] Pending before the court is Qualis' motion for summary judgment (doc. 45), which the plaintiff opposes (doc. 51).  Having considered the record and the parties' arguments, the court finds that there is no genuine issue of material fact and that Qualis is entitled to summary judgment as a matter of law.

## BACKGROUND

Qualis is a small, female-owned business, headquartered in Huntsville, Alabama, that provides engineering analysis, design, testing, and support to both commercial and government customers throughout the United States.  Qualis entered into a subcontract with Jacobs Engineering Group, Inc. ("Jacobs"), a worldwide provider of professional technical services, to provide engineering support under a Technical Engineering and Acquisition Support contract ("TEAS Contract") Jacobs entered into with the United States government to provide conventional weapons systems development and testing for the

---

[1] She also filed a claim for age discrimination, but later voluntarily dismissed that claim in light of the Supreme Court's holding in *Gross v. FBL Financial Servs., Inc.*, 557 U.S. —, 129 S. Ct. 2343 (2009), which precludes mixed motive age discrimination claims.

United States Air Force at the Eglin Air Force Base ("Eglin") in Okaloosa County, Florida. The TEAS Contract was a non-personal services contract under which work was performed independently by Jacobs and its subcontractors, who worked together on various tasks under the direction of a task leader.[2]  Because the TEAS Contract was a non-personal services contract, certain measures had to be taken to prevent the creation of an employer-employee relationship between the government and employees of Jacobs and its subcontractors, including a prohibition on direct dealing between the two insofar as staffing and other personnel matters were concerned.  According to Qualis, it maintained a policy prohibiting direct contact with the customer, which was explained to all employees upon being hired to work on the TEAS Contract, along with the fact that a violation of the policy could result in termination of Jacobs' and/or Qualis' services under the contract.

At all pertinent times, Branford J. McAllister was Jacobs' director of developmental test support under the TEAS Contract.  McAllister testified in his deposition that Jacobs maintained five departments under the TEAS Contract, each of which was responsible for developing and testing air-delivered munitions for a specific Air Force customer. McAllister's department supported the 46th Test Wing.  Although each of Jacobs' subcontractors hired its own employees, McAllister participated in the interview process, made recommendations for hiring and firing, and provided feedback on employees' performance.  Qualis hired the plaintiff in May 2005 as an Engineering Assistant III ("EA III"), or ground truth technician, for the "Chicken Little Secret Sensor Task Order" ("Chicken Little Project"), a project involving specialized testing on developmental seekers and sensors.  As a ground truth technician, the plaintiff was responsible for creating a historical record of all testing activities, which included collecting meteorological data, taking photographs and physical measurements, observing testing, and preparing reports.  At the time the plaintiff was hired, John Winterberger was the task leader for the Chicken Little project.  In approximately January 2006, however, William Terrell, a senior engineer for

---

[2] According to 48 C.F.R. 37.101, "[n]onpersonal services contract means a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."

Qualis who had previously worked with the plaintiff and recommended her for the job, filled the position.[3]  As task leader, Terrell was responsible for assigning work to the members of his team and communicating with the government regarding issues pertaining to the project.  He reported to Annette Seda, Qualis' Manager or "Principal" for the TEAS sub-contract, and also was accountable to McAllister.

As a government contractor, Qualis was required to accurately allocate all labor charges under the TEAS Contract to ensure that they were reasonable and complied with Federal Acquisition Regulation reimbursement requirements.  To do so, Qualis used an electronic timekeeping system that required all employees to account daily for the time they worked.  The plaintiff admittedly had difficulty submitting her time cards in a timely manner and was aware that her timekeeping deficiencies were problematic.[4]  According to Qualis, the plaintiff also failed to accurately record her time, used incorrect charge codes, and billed for work performed at home without receiving prior approval.  Qualis further claims that the plaintiff had attendance problems.  Specifically, Qualis contends that the plaintiff frequently arrived to work late, left early, and took time off without first obtaining approval.  It is undisputed that the plaintiff was counseled repeatedly regarding performance issues.

On December 6, 2005, Seda emailed the plaintiff about her time card after the plaintiff failed to respond to a "number of notices pitched in [her] direction" in that regard.  In the email, Seda advised the plaintiff that her time card was "noticeably delinquent" and

---

[3] Prior to working for Qualis, the plaintiff was employed by TASC, which eventually became Northrup Grumman IT.  According to the plaintiff's interrogatory responses, Northrup Grumman IT entered into a Munitions Test Task Ordering Contract ("MTTOC") with the United States Air Force ("USAF").  In April 2002, the USAF realigned and transferred the work performed under the MTTOC to the TEAS Contract.  From approximately October 2002 through June 2003, the plaintiff assisted Northrup Grumman in the transfer of work from the MTTOC to the TEAS Contract.  Before joining Qualis, Terrell worked on the TEAS contract for another subcontractor and, in that capacity, worked with the plaintiff while she was employed by Northrup Grumman.  Terrell thought the plaintiff's experience and attitude would be an asset to the Chicken Little team.  He thus contacted the plaintiff in March 2003 and asked whether she would consider joining the team as an EA III. The plaintiff interviewed with McAllister, Winterberger, and Terrell and was offered a position on the Chicken Little Project.

[4] The plaintiff acknowledged in her deposition that she was on a list of delinquent timekeepers and that she knew recording time on a daily basis was an important aspect of Qualis' responsibilities under the TEAS Contract and that her failure to maintain a daily accounting of her work created problems for Qualis.

that if she did not respond by 9:00 that morning, Seda would assume there was a major communication problem and would initiate a search party to make sure the plaintiff was okay.  Seda reminded the plaintiff that her time card was "an obligation of the job not to be taken lightly" and that her "failure to maintain a daily accounting of [her] work impact[ed] a contractual requirement that could result in severe adverse actions against [the plaintiff] and the company."  Finally, Seda advised the plaintiff that if she was on leave or out of the office, she could post timecard entries prior to leaving and that there was no excuse for her failure to remain current with her time.  The plaintiff responded to Seda's email two days later, apologizing "once again . . . for the delay" and implying that the delay was caused by a lack of access to the internet.  At the time, the plaintiff was working on the MANPADS project in Tonopah, Nevada.[5]  According to Terrell, the plaintiff was the only employee who complained of a lack of access to the internet or difficulty entering time while working on the MANPADS project or in any other remote location.  In fact, Terrell testified in his deposition that he spent months working in Nevada on the MANPADS project and never had any problem with the satellite internet system.  He also testified to other ways in which employees could submit their time when they were working in remote locations or were otherwise unable to connect to Qualis' timekeeping system.

It appears that the plaintiff continued to violate Qualis' timekeeping policies despite Seda's warning.  Although the plaintiff received a positive Performance Assessment on April 24, 2006, there was a notation on the form that the plaintiff intended to "focus more on company matters such as time cards and expense reports," which indicates that her timekeeping deficiencies persisted.  That the plaintiff failed to improve her timekeeping is confirmed by a January 11, 2008, Corrective Action Record in which Terrell stated that the plaintiff had continuously failed to timely submit time cards and listed seven occasions in less than four months in which her time cards were late, requiring the involvement of the time card approval manager and numerous changes to the time keeping system.  In the

---

[5] The MANPADS project also fell under the TEAS Contract and involved the testing of weapons in remote areas of Nevada under fairly rudimentary conditions.  Although the plaintiff was hired by Qualis to work on the Chicken Little Project, she worked intermittently on the MANPADS project as well.

Corrective Action Record, Terrell reiterated Qualis' timekeeping policies and procedures, as well as the reasons compliance with them was critical, and instructed the plaintiff to begin complying immediately.

In addition to her failure to timely submit time cards, the plaintiff repeatedly violated Qualis' leave policy. As Seda explained in a Declaration submitted in support of Qualis' motion, Qualis required employees to coordinate their schedules with their task leaders so that it could effectively manage employees' schedules and ensure that customers' tasks were properly and efficiently staffed. The plaintiff routinely disregarded Qualis' leave policy, taking leave without coordinating it with her task leader and, in some instances, not providing advance notice to anyone at Qualis. For example, the plaintiff took personal leave the week of August 11, 2008, to travel to Denver, Colorado, for the funeral of her nephew, who was killed in a tragic automobile accident. Although the plaintiff was to return to work on Monday, August 18, she did not report to work that day. She claims that she tried to call Terrell a number of times and left messages for him the night before, but she did not email Terrell until 11:01 a.m. on the morning of her absence, at which time she apologized for being absent and stated that she was trying to cope with her nephew's death, which she described in gruesome detail. Later that day, the plaintiff emailed Randy Duty, the deputy task leader, requesting to take leave on August 19. Although it is not clear from the record whether Duty responded to the plaintiff's August 18 email, he emailed her on August 25, reminding her that she was required to comply with Qualis' procedures in order to be granted leave and also that she was required to timely submit her time and notify her task leader any time she left and returned to her work site. Terrell sent the plaintiff a similar email, reiterating Qualis' leave policy and the necessity of coordinating all leave with him. The next day, the plaintiff emailed Seda, Terrell, and Yvonne Roper, Seda's assistant, informing them that she intended to take leave on Friday, August 29, and then again at some point during the week of September 22.[6] Seda responded to the plaintiff later that day, pointing out that she had not submitted a leave request, as required,

_____

[6] The plaintiff intended to take leave in September to attend her fianceé's high school reunion in Hebron, Ohio.

and reminding her that, in order to take personal leave, she was required to first coordinate her absence with her task leader and then to send a request to Seda, with a copy to Roper, who would post the approval so that both the plaintiff and management would be aware of it.  At 5:52 a.m. on September 10, 2008, the plaintiff emailed Terrell requesting to take leave because her mother was having cataract surgery that day.  Terrell responded shortly thereafter, approving the plaintiff's request.  The next day, the plaintiff emailed Terrell to let him know that she had a doctor's appointment and would like to take an early lunch; she also requested to take leave the following day to accompany her mother on a follow-up visit with her doctor.  Once again, Terrell approved the plaintiff's request.  Less than two weeks later, on September 22, 2008, the plaintiff emailed Terrell requesting the afternoon off to drive to the Harley Davidson shop in Pensacola.  It appears that Terrell granted that request as well; indeed, Seda emailed the plaintiff the next day, when she was out sick, noting that the plaintiff had been fine the previous day and had taken a half-day off for personal reasons, "leaving tasks/actions incomplete with a pending plan for vacation, again without coordinating with [her] task leader."  Seda advised the plaintiff that she had spoken to Terrell regarding the plaintiff's September leave request and that because the plaintiff did not coordinate her leave with Terrell, Seda was unable to approve it.  Seda agreed to post the request on the calendar, however, while the plaintiff coordinated actions to be completed on her task and again reminded the plaintiff of Qualis' leave policy.  Seda also noted that the plaintiff's time card had not been filled out the previous day.

Although the plaintiff was repeatedly counseled regarding her failure to adhere to Qualis' timekeeping and leave policies, it was her direct contact with the government regarding personnel issues that resulted in the most severe disciplinary measures.  On May 2, 2008, the plaintiff sent an email to her team members, which included Jacobs employees and Air Force representatives, complaining that her request to use compensatory time had been denied and that she had been told that she had to either use her comp time before June or lose it.[7]  McAllister overheard Terrell discussing the plaintiff's

---

[7] According to McAllister, exempt employees who worked over eighty hours in a two-week period accrued compensatory time that could be used later, with certain restrictions.

email and requested that Terrell forward it to him. After he reviewed the email, McAllister forwarded it to a number of individuals, including Seda, expressing concern about the plaintiff's conduct. McAllister stated that he was at the "end of his patience" with the plaintiff and suggested that harsher disciplinary action might be in order considering that "simple discussions" with the plaintiff had proven ineffective. Robert Yelverton, Qualis' Deputy Principal, agreed,[8] but Seda chose to give the plaintiff another chance and only verbally counseled her.[9] A few months later, however, on July 28, 2008, the plaintiff again had direct contact with the government. Although Terrell had informed the plaintiff that he did not anticipate any TEAS tasking on the MANPADS project at the time, the plaintiff emailed David Misita, the government representative in charge of the project, attaching a proposed schedule for an upcoming test but making it clear that, if she were staffed on the task, she would need to take time off in September to attend her fianceé's high school reunion in Ohio.[10] The plaintiff suggested that someone fill in for her during her absence and offered to ask Jason Geitgey, the government's squadron leader, for money to play for the extra flights that would be required as a result of her absence. The plaintiff later asked Misita if the government would pay for a portion of her trip to Ohio.[11]

When Terrell emailed the plaintiff on August 25 about her leave, he mentioned that he was concerned that she had coordinated her own schedule with Misita and other government personnel without the knowledge or input of anyone else in the Chicken Little

---

[8] In a May 5, 2008, email to Seda, Yelverton indicated that he had spoken with Terrell and tried to mitigate the situation before McAllister became involved, but that "things ha[d] accelerated a bit." Yelverton offered to deal with McAllister if Seda wished and opined that the plaintiff had left them no choice but to institute disciplinary proceedings. Yelverton agreed with McAllister that the plaintiff's conduct had progressed to the point that they could not "talk around it any longer."

[9] According to her Declaration, however, Seda considered the plaintiff's actions to be highly unprofessional and "an egregious violation of company policy."

[10] In a memorandum she prepared in response to the September 2, 2008, Corrective Action Record, the plaintiff stated that she agreed to support the test only if she were allowed to take time off to attend the reunion.

[11] Based on the record, it appears that, had the plaintiff not been going to Ohio for her fianceé's high school reunion, she would have flown home to Pensacola for the weekend at the government's expense.

group. He also stressed again that all staffing and scheduling matters had to be coordinated through him to ensure that projects were adequately staffed and informed the plaintiff that, in coordinating her schedule directly with Misita, she caused scheduling difficulties that he was able to resolve only by requiring other employees to assume additional work. Terrell made it clear to the plaintiff that she was not authorized to coordinate her own schedule with any government personnel without his prior approval.

On August 28, 2008, McAllister emailed Seda, Terrell, and Duty outlining a number of concerns about the plaintiff's performance and professionalism, including the fact that she was not coordinating her schedule with her task leader and, instead, was communicating directly with the government. McAllister advised that the plaintiff's "lack of reliability, accountability, and credibility regarding her whereabouts and timecard ha[d] reached the point at which [Jacobs] could no longer trust her and, therefore, [could] not afford to continue to employ her on the task." According to McAllister, the amount of time TEAS leadership spent supervising the plaintiff outweighed the benefit they received from her work, particularly given her "continued lack of meticulousness in providing ground truth data," unreliability with regard to whereabouts and time cards, failure to communicate with her Task Leader, and "frequent contact and manipulation of the customer." In McAllister's opinion, in order to preserve Jacobs' relationship with the government and accomplish an upcoming test, the plaintiff needed to remain on the TEAS schedule for the duration of the test but should be reassigned to a different department once the test was complete. Although McAllister was willing to discuss the matter further, he planned for the plaintiff's work on the Chicken Little Project to end on November 22. The next day, McAllister suggested that the group consider convening an Incident Review Committee ("IRC") to investigate the plaintiff's conduct or, at a minimum, "assess the broader issue of [the plaintiff's] value to the task and to the customer, which ha[d] been called into question repeatedly over the past couple of years, and particularly in the past month or so." Insofar as McAllister was concerned, "it ha[d] become clearly evident that th[e plaintiff's] position [was] no longer needed on the task" because her "value [was] no longer equivalent to the costs" associated with her employment and they could "save the customer much needed

funds and eliminate a source of friction and unprofessionalism by eliminating [the plaintiff from] the task." The only question remaining for McAllister was when that would occur. The same day, Seda emailed the plaintiff to arrange a meeting to discuss an "urgent matter of policy."[12] Seda then issued the plaintiff a Corrective Action Record, which was designated as a final written notice, for requesting travel funding and personal time off directly from Misita rather than obtaining authorization from TEAS management. In the Corrective Action Record, Seda advised that an IRC would be convened to investigate the plaintiff's conduct and directed the plaintiff to cease any action that could be interpreted as personal services and strictly comply with all applicable leave policies.

As Seda had advised the plaintiff, an IRC consisting of individuals in leadership positions at both Jacobs and Qualis, including McAllister, Seda, and an independent Jacobs director, was convened to investigate the plaintiff's actions. During the course of the investigation, the IRC interviewed the plaintiff, Terrell, and Duty.[13] According to Seda, after thoroughly investigating the matter, the IRC found that the plaintiff routinely coordinated her travel and tasking directly with the government, despite her task leader's instructions that she not do so; demonstrated little consideration for TEAS travel and leave policies and procedures; consistently circumvented management structure; and demonstrated a total disregard for the sensitivities of personal services contracts, all of which adversely impacted Jacobs' and Qualis' relations with the government.[14] Seda met with the plaintiff on October 2, 2008, to inform her of the IRC's findings and to review a

---

[12] According to Seda, the plaintiff's actions not only violated Qualis and TEAS policy and procedure, but they also could have resulted in termination of Jacobs' and/or Qualis' services under the TEAS Contract and precluded the plaintiff's entire team from receiving a merit raise.

[13] Prior to meeting with the IRC, the plaintiff asked Duty if he would be attending the meeting. When he responded that he would not, the plaintiff asked whether she needed to bring someone with her, as it "seem[ed] like a Kangaroo Court session."

[14] Although Seda stated in her Declaration that the plaintiff admitted to the IRC that she sought and took direction directly from the government regarding travel and tasking despite having been instructed not to do so, the plaintiff claims that she was instructed by both Duty and Terrell to contact Misita directly regarding her request for time off and payment of a portion of her flight. In the memorandum she prepared in response to the CAR, however, plaintiff stated that Terrell and Duty simply inquired whether the plaintiff had worked things out with Misita and had his written approval.

letter of reprimand in which she indicated that the plaintiff had created a personal services environment by coordinating travel and tasking and discussing MANPADS testing directly with the government in violation of Qualis' and TEAS policies. She also noted that the plaintiff violated the TEAS travel policy by having a government representative, rather than TEAS management, complete her travel authorization form. Seda informed the plaintiff that she would be placed on a Performance Improvement Plan ("PIP") and was required to review several policies with Qualis management and TEAS leadership. Before placing the plaintiff on the PIP, however, Seda, McAllister, Michelle Williams, who was Qualis' on-site human resources representative, Terrell, and Duty met with the plaintiff to discuss the terms of the PIP and their expectations with regard to her performance thereunder. According to the plaintiff, McAllister expressed extreme dissatisfaction with her during the meeting and stated that if it were up to him, she would be fired. Seda, however, informed the plaintiff that she could continue to work on the Chicken Little Project for thirty days, during which time her performance would be evaluated and that, if it improved, she would be allowed to remain on the Chicken Little Project indefinitely.[15] Following the meeting with the plaintiff, McAllister met separately with Terrell and Duty and instructed them to give the plaintiff "a fair and equitable opportunity to perform as [they] had envisioned she could" and to continue scheduling her to work on the project. Seda and Williams met again with the plaintiff to review Qualis' policies and procedures and to provide her specific guidance on how to comply with them.

As part of the PIP, the plaintiff was required to meet weekly with Terrell, McAllister, Duty, Seda, and/or Williams to discuss her performance. During the first PIP meeting, held on October 14, 2008, the plaintiff received only positive feedback. In fact, Duty prepared a memorandum to McAllister and Terrell stating that the plaintiff had completed her work, performed additional work, and was doing a good job. As of that meeting, the plaintiff was scheduled to work on the Chicken Little project for several more months. The next day, however, Terrell gave the plaintiff a Task Feedback Form in which he noted that she had

---

[15] McAllister testified in his deposition that both he and Seda told the plaintiff that she would be allowed to remain on the Chicken Little Project if she performed satisfactorily under the PIP.

performed very well on the MANPADS project but that her performance on the Chicken Little project had deteriorated to an unacceptable level. Like McAllister, Terrell stated that the amount of time Qualis spent counseling the plaintiff and documenting her substandard performance outweighed any benefit it received from her work. According to Terrell, although the plaintiff had once been the lead ground truth technician, she "now exert[ed] only the minimum amount of initiative to marginally complete assigned tasks" and "failed to produce quality products in a timely manner." Terrell advised the plaintiff that she needed to "improve communication with her task leads, focus on improved attendance, and put an end to the late for work, left early, and missed entire days of work, incidents.'" He instructed her that she needed to improve her performance in a number of other respects, including the quality and timeliness of her work, compliance with timekeeping and leave policies, and avoiding direct contact with the government, and that unless she was able to focus her attention on achieving a professional level of performance, respect supervision and policy, and demonstrate marked improvement in her performance, she would not be considered for retention on his team.

On October 16, shortly after the first PIP meeting, Jacobs sent a letter to Seda, informing her that, as of November 5, 2008, there would be no more funding for the plaintiff's task. Seda requested that the plaintiff come by her office on October 20, 2008, the day the next PIP review meeting was scheduled to be held, to pick up a letter regarding the elimination of her position and to discuss future tasking.[16] Seda intended to explain to the plaintiff that the letter was simply a formality and that everyone had agreed

---

[16] On October 20, Stephanie Walsh, Qualis' Director of Human Resources, prepared a draft of a letter to the plaintiff, stating that Qualis had been officially notified by Jacobs that the plaintiff's position on the TEAS contract had been removed, effective October 31, 2008. Walsh informed the plaintiff that her name would continue to appear on the "at-risk" list for TEAS and that her qualifications would be compared to all open positions up until that time. Walsh further advised the plaintiff that Qualis had taken steps to find other work for her and would continue to do so until the end of the month and that if the company was not able to place her in a compatible position, the human resources department would notify her and offer her additional guidance. Finally, the plaintiff was advised that she was eligible to apply for unemployment benefits because of the loss of work. A second draft of the letter was prepared on October 22 and included Seda's name and signature as well. It was the latter version of the letter that the plaintiff received.

that she would remain on the Chicken Little project if she successfully completed the PIP.[17] She also intended to inform the plaintiff that, even if she were removed from the Chicken Little project, Qualis would place her on its "available for tasking" list and attempt to find other work for her.  The plaintiff was unable to meet with Seda on October 20  due to a work assignment, however, and called in sick the following day.  The plaintiff emailed Seda on October 21 implying that her illness was the result of stress stemming from a conversation she had with Seda that morning and informing Seda that she would return to work at noon on October 22.  The plaintiff also requested that Seda advise her "right away" of other available tasks in the event she was going to be removed from the Chicken Little Project.  Seda responded that she was still waiting to hear whether Jacobs would extend the November deadline.[18]

Although Qualis had no intention of removing the plaintiff from the Chicken Little Project or terminating her employment at that time, when the plaintiff reported to work on October 22, she cleaned out her desk, turned in her badge, and left a letter for Seda thanking her for her help and advice and indicating that she could no longer work on the Chicken Little Project due to the uncertainty of her future and alleged harassment by Terrell and McAllister.[19]  The plaintiff also requested again that Seda let her know if

---

[17] According to both McAllister and Seda, Jacobs was required to provide employees on the TEAS Contract fourteen days written notice whenever there was a possibility that their work might come to an end. Because the plaintiff's retention under the TEAS Contract depended on her successful completion of the PIP, Jacobs was required to give her written notice fourteen days before the PIP was to be completed.  According to Seda, McAllister, and Terrell, however, if the plaintiff had continued to perform well under the PIP, she would have remained on the Chicken Little Project indefinitely.

[18] According to Mcallister, Seda requested that Jacobs extend the deadline set forth in the PIP so that she would not have to give the plaintiff fourteen days notice since her performance had improved.  McAllister informed Seda that he would have to check with Terrell and Duty, but that if the plaintiff was performing well, he would be willing to extend the deadline.  After discussing the matter with Terrell and Duty and confirming that the plaintiff was performing satisfactorily," McAllister agreed to extend the date to either another date certain on which they had not yet agreed or indefinitely.

[19] Specifically, the plaintiff stated in the letter, which was dated October 22, 2008, that Terrell no longer wanted her on his team and that Duty had confirmed that fact, as well as the fact that Terrell was supported by McAllister in that regard.  The plaintiff then discussed her history with Qualis, including the awards she had received, and characterized criticisms of her performance as "baseless" in light of those awards and as "personal attacks on [her] professionalism."  According to the plaintiff, her placement on the "needs work" list was "due to [those] two men not wanting [her] on their task" and not to her work ethic or performance.  The

additional tasking came available.  After the plaintiff's departure, Seda and McAllister attempted to contact her and placed her on intermittent status while continuing to try to find assignments for her.  When the plaintiff failed to respond to their efforts, Qualis concluded that she had abandoned her employment.  On January 13, 2009, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), claiming that she had been discriminated against on the basis of her sex and age.[20]

## DISCUSSION

A.    <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party.  *Id.* (also noting "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude" summary judgment).  Summary judgment is not

---

plaintiff then accused Terrell and McAllister of harassment.  The plaintiff clarified in her response to Qualis' motion, however, that she is not asserting a claim for sexual harassment and, instead, is asserting a claim only for discriminatory discharge based on the October 22 letter.  In conclusion, the plaintiff advised Seda that "[t]he continued threat that [her] tasking [was] ending ha[d] escalated to the point that [she was] stressed and physically ill" and that "[k]nowing that [she was] without a task ha[d] made the situation unbearable and caused [her] to be physically ill."

[20] The plaintiff also filed a claim for unemployment compensation.  Although the claim is dated October 19, 2008, she testified in her deposition that she filed it on either October 21 or October 22.

Case No. 3:09cv429/MCR/EMT

appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). As stated, when assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party. *See Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

B.     Plaintiff's Title VII Claim

Title VII makes it unlawful "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The plaintiff complains that she was terminated because of her sex in violation of Title VII. She concedes, however, that she has no direct evidence of sex discrimination; rather, the plaintiff is relying on circumstantial evidence in support of her claim. Because the plaintiff is relying on circumstantial evidence, the court must apply the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). *See Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Under this framework, the plaintiff has the burden to establish a *prima facie* case of discrimination by demonstrating that "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006). If the plaintiff establishes a *prima facie* case of discrimination, a rebuttable presumption arises that the employer unlawfully discriminated against her and the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *Brooks*, 446 F.3d at 1162. A trier of fact does

not have to believe the employer's proffered reason in order to find that the employer has met its burden, "[for the burden-of-production discrimination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). Nor is an employer required to persuade the court its reason is "legitimate." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), *overruled on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). The employer is required only to present evidence which, taken as true, permits a reasonable fact finder to conclude there was a nondiscriminatory reason for the employment decision. *St. Mary's Honor Center*, 509 U.S. at 509; *Cooper*, 390 F.3d at 725. Once the presumption is rebutted, the plaintiff must show that the employer's reason was not the genuine cause for the adverse action but merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. A plaintiff can do so "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Brooks*, 446 F.3d at 1163. With respect to the latter, "the plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper*, 390 F.3d at 725. "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). The ultimate burden remains with the plaintiff to raise a genuine issue of material fact as to whether the employer's explanation is pretextual and that discrimination was the true cause for the employment decision.

The parties do not dispute that the plaintiff is a member of a protected class or that she was qualified for the job. However, the plaintiff has not shown that she suffered an adverse employment action and thus has not established her *prima facie* case. The plaintiff claims that she was terminated on October 22, 2008, when she retrieved the letter informing her that Jacobs had eliminated her position under the TEAS Contract, effective November 5, 2008. When she retrieved the October 22 letter, however, the plaintiff tendered a letter of resignation, which had been prepared in advance. Moreover, the

October 22 letter did not state that the plaintiff's employment had been terminated; rather, it stated that the plaintiff would have no position under the TEAS Contract after November 5, 2008. At the time she tendered her resignation, therefore, the plaintiff had at least eleven days of tasking remaining on the Chicken Little Project, and Seda had explained to the plaintiff that she was attempting to extend that time.[21] Seda also intended to explain to the plaintiff that the October 22 letter was a mere formality, a fact which is undisputed, and that the plaintiff would remain on the Chicken Little project as long as she continued to perform satisfactorily under the PIP.[22] Seda further intended to advise the plaintiff that, even if she were removed from the Chicken Little project, Qualis would attempt to place her on another task, as the plaintiff had requested. Seda never got the opportunity to explain those matters to the plaintiff, however, because the plaintiff packed her belongings on October 22, tendered her letter of resignation, and refused to respond to Qualis' attempts to contact her despite the fact that she had requested that Seda notify her if any other tasking was available. Qualis thus reasonably concluded that the plaintiff had abandoned her employment and ceased its efforts to accommodate her.[23]

---

[21] Although Seda requested that McAllister grant a two-week extension of the deadline set forth in the PIP so that she would not be required to notify the plaintiff that her position might be eliminated, Seda stated in her Declaration that Jacobs had previously agreed that, even if an extension of the plaintiff's PIP was necessary, the plaintiff would not be removed from the Chicken Little Project until after January 1, 2009. Seda had hoped to explain that fact to the plaintiff when the plaintiff retrieved the October 22 letter.

[22] McAllister and Terrell confirmed that the plaintiff would remain on the Chicken Little Project in the event she performed satisfactorily under the PIP and that, as of October 22, her performance had been more than satisfactory. In fact, Terrell was upset when he learned about the October 22 letter because he had scheduled the plaintiff to work "numerous months out" and no one had apprised him of the October 22 letter, which he later learned was only a formality.

[23] The plaintiff has neither pled a claim for constructive discharge in her complaint nor addressed such a claim in her response to Qualis' motion. To the extent she claims she was constructively discharged, however, such claim fails as a matter of law. A constructive discharge occurs "when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (citation omitted). "To prove a constructive discharge, a plaintiff must demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1283 (11th Cir. 1999) (internal quotations omitted). "[M]ere suspicion of an unsubstantiated plot [to terminate an employee] is not an intolerable employment condition." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir. 2003). Moreover, an employee must act reasonably before resigning and must notify her employer of the improper behavior and afford the employer an opportunity to rectify the situation. *See Slattery v. Neumann*, 200 F.

Even if the plaintiff had been terminated, her discrimination claim would nevertheless fail because there is no evidence that gender played any role in any employment action against her. To the contrary, the evidence shows that the plaintiff repeatedly violated Qualis' policies and procedures, as well as those under the TEAS Contract, and that those violations were the cause of each disciplinary action she received, including being placed on the PIP, which precipitated the October 22 letter. The evidence also shows that, in the event the plaintiff had been removed from the Chicken Little Project, her removal would have been based on Jacobs' request, not her gender. Indeed, it is clear that Qualis had no intention of terminating the plaintiff's employment unless or until Jacobs insisted that she be removed from the Chicken Little Project and, even then, Qualis intended to place the plaintiff on the needs tasking list and to assist her in procuring other work under the TEAS Contract.[24] It is likewise clear that, had the plaintiff continued to perform satisfactorily under the PIP, she would have remained on the Chicken Little Project indefinitely; Seda, McAllister, and Terrell all testified unequivocally to that fact. The only support the plaintiff has offered for her claim that she was terminated because of her gender is her belief that Terrell developed a disdain for women following his divorce. Not only is the plaintiff's conclusory allegation regarding Terrell's attitude towards women insufficient to sustain a Title VII claim, but Terrell had no authority to terminate the plaintiff's

---

Supp. 2d 1367, 1371 (S.D. Fla. 2002). "'A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.'" *Van der Meulen v. Brinker Int'l*, 153 Fed. Appx. 649, 656 (11th Cir. 2005) (quoting *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996)). "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast.'" *Id.* (quoting *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987)). The plaintiff testified in her deposition that, although she had not yet retrieved the October 22 letter from Seda, she assumed was being terminated based on Duty's comments to that effect on October 20. The plaintiff acknowledged, however, that when Duty suggested that she might be terminated, he had not seen a draft of the October 22 letter and was simply speculating as to its contents. The plaintiff nevertheless called in sick on October 21 and cleaned out her desk on October 22, despite the fact that she had eleven days remaining on the Chicken Little Project and had been told that Qualis would attempt to find other work for her. Under the circumstances, no reasonable trier of fact could conclude that the plaintiff was constructively discharged.

[24] Although Terrell stated in the October 15, 2008, Task Feedback Form that the plaintiff would not remain on his team unless her performance improved, Terrell did not have the authority to terminate the plaintiff's employment.

Case No. 3:09cv429/MCR/EMT

employment and played no role in the decision to place her on the PIP or issue her the October 22 letter.

The plaintiff also has failed to identify any similarly situated male employee who was treated more favorably than she. In fact, the plaintiff has not identified a single male employee who repeatedly failed to adhere to Qualis' policies and procedures, much less an employee who was placed on a PIP after placing Qualis and Jacobs at risk of being terminated under the TEAS Contract.[25] In response to Qualis' motion, the plaintiff identifies two males she claims were promoted over her after she trained them. Because she is not asserting a claim for failure to promote, however, those individuals are not similarly situated. She also mentions, but does not identify, a male employee whom she claims was treated more favorably with regard to the use of compensatory time and points to David Haley, whom she claims was allowed to take over forty hours of leave despite the fact that he had not accumulated that much time. Again, because the plaintiff's claim is not based on the use of compensatory or leave time, those individuals are not similarly situated. The plaintiff thus has failed to establish the third element of a *prima facie* claim of gender discrimination.

Finally, even if the plaintiff had established a *prima facie* case of discrimination, Qualis has articulated a legitimate, non-discriminatory reason for any even arguably adverse employment action against the plaintiff, and the plaintiff has adduced no evidence that Qualis' reason was a pretext for unlawful discrimination. Indeed, the plaintiff has offered no evidence that gender played any role in any employment action against her or that Qualis' proffered reason is unworthy of credence. The record, instead, is replete with instances of misconduct and poor performance by the plaintiff, as well as evidence that those instances served as the basis of all employment action against her. Because the plaintiff has neither established a *prima facie* case of sex discrimination nor offered any

---

[25] The plaintiff testified in her deposition that she believes another employee, Ronald Stevenson, had either been placed on a PIP or questioned about his time cards, but she has offered no evidence to substantiate her allegation in that regard or her claim that Stevenson, in fact, was similarly situated to her.

evidence from which a reasonable jury could conclude that Qualis' reason for her alleged termination was a pretext for unlawful discrimination, summary judgment is appropriate.

**CONCLUSION**

Accordingly, it is hereby ORDERED that defendant's motion for summary judgment (doc. 45) is **GRANTED**.  The Clerk of Court is directed to enter summary final judgment in favor of the defendant, consistent with this order, and tax costs against the plaintiff.

**DONE AND ORDERED** this 17th day of February, 2011.


s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**